George F. Carter, Trustee *v.* Cooper Jacoway

5-4053                                          408 S. W. 2d 875

Opinion delivered December 12, 1966

*Warren & Bullion,* for appellant.

*Spitzberg, Bonner, Mitchell & Hays,* for appellee.

Carleton Harris, Chief Justice. This is an appeal from a decree of the Pulaski Chancery Court (Second Division), wherein Cooper Jacoway, a Little Rock attorney, and appellee herein, was given judgment against George F. Carter, Trustee of the testamentary trust estate of E. L. Carter, deceased, in the amount of $9,411.31, together with all costs, and interest at the rate of 6% per annum from January 31, 1966, until paid. The pertinent facts are as follows:

E. L. Carter died testate in 1950, and, by his will, created a trust, naming his widow, and son, George

Carter, trustees, and naming George Carter and Mary Louise Carter Wallace, a daughter, as beneficiaries. Mrs. Carter subsequently died, and George Carter is the sole surviving trustee. Helen Carter was the wife of George Carter until their divorce, and George conveyed one-half of his interest in the trust estate to Helen, the result being that George Carter is the trustee of a trust estate in which he, his sister, Mary Louise Wallace, and his ex-wife, Helen Carter, are the beneficiaries.

In the latter part of 1962, the sister and ex-wife instituted suit in Pulaski Chancery Court against the trustee, charging him with mismanagement of the trust properties, with improper investments, breaches of his fiduciary duty, and with refusal to make records available to the beneficiaries; judgment was sought against him for approximately $33,000.00, and his removal as trustee was prayed. Carter then employed Jacoway to defend the suit, agreeing to pay an attorney's fee of $1,500.00, without regard to the outcome of the litigation, and the additional sum of $3,000.00 if Jacoway "were able to defend the suit successfully and to give the trustee final protection against the charges in the suit."

Subsequently, Carter decided that he would like to terminate the trust by disposing of the assets, distributing the proceeds, and obtaining his discharge as trustee. Jacoway was consulted with reference thereto, and the two men entered into an agreement, the terms of which were embodied in a letter from Carter to Jacoway, dated November 26, 1963. The principal property owned by the trust is a half interest in the Colburn Hotel, located in Denver, Colorado. The other half interest is owned by a Mrs. Evelyn Turner and her mother. Carter, as an individual, had an agreement with the Turners to receive a commission for selling the Turner interest in the hotel, the amount depending upon the sale price of the property. Carter agreed to pay Jacoway half of any net amounts that he might receive from the Turners for disposing of their interest. Because of the impor-

tance to this litigation of the letter of November 26, 1963, from Carter to Jacoway, heretofore referred to, same is herewith set out in full:

Dear Mr. Jacoway:

In view of the many elements involved, I think it is a good idea for us to have a memorandum concerning your employment in connection with the E. L. Carter Trust.

At the time that my sister, Mrs. Wallace, and my ex-wife, Helen Carter, brought suit against me in connection with my Trusteeship of the above Trust, I employed you to represent me as Trustee, and I agreed to pay you, as Trustee, a fee of $4,500.00 if you were able to defend the suit successfully and to give the Trustee final protection against the charges in the suit.

After that I asked you to represent me in the other matters connected with the Trust, including the disposition of the trust assets and the liquidation and termination of the Trust and my discharge as Trustee. It was and is my intention to sell the Colburn Hotel and when that is sold, together with the few remaining assets in Arkansas, I shall seek to have the Trust assets distributed and the Trust terminated. I shall want to receive an appropriate order of discharge that will protect me against any further claims that could be brought by the beneficiaries against me as Trustee. Of course, I will want you to represent me actively in all such matters. For those services I have agreed to pay you a reasonable fee and at this time I consider that a minimum fee for such services should be $10,000.00, in addition to the above. If any unusual services are required, or some now presently unexpected litigation not involving the matters in the first suit, should arise, I recognize that a reasonable additional fee will be in order, but I contemplate that the Trust should be wound up without further unusual services, other than as above contemplated.

In addition, I have agreed individually to pay you half of any net amounts, over and above expenses, that I may receive from Miss Evelyn Turner or her mother as an award or compensation for my services as an individual in selling their interest in the Colburn Hotel.

If any matters involving the Riceland Hotel should arise, and if I should find that I need your services in that connection, that work is outside anything contemplated above and will be determined upon an independent and separate basis.

Please know that I appreciate the efforts that you have made in my behalf in the past.

Very truly yours,
George F. Carter

The Colburn Hotel did not sell, and on April 2, 1964, Jacoway directed a letter to Carter stating, "Since the Hotel did not sell, I want you to treat this letter as my voluntary termination of the agreement so far as it related to any money that you, as an individual, might receive from the Turners or from the sale of their property. * * * This letter does not change or affect in any way, of course, the fees that we have agreed on to be paid to me for representing you as Trustee of the E. L. Carter Trust, and they will remain fixed as agreed." By summer of the same year, Carter had only paid, in addition to some expense money (about which there is no controversy), the total sum of $1,500.00 on Jacoway's fee, and Jacoway, testifying that he was disturbed because Carter was making no effort to sell the hotel,[1] talked to appellant on the telephone, and, during the conversation, said, "Why don't you pay me for services up to date, and get somebody else for whatever you need from here on out?" On December 7, Carter directed a letter to Jacoway asking that the latter send "a statement for your legal services to our

[1] In the meantime, Carter had remarried, and he and his new wife were living at the Colburn Hotel.

trust," but on December 16, Jacoway received the following telegram from Carter:

"PLEASE CONSIDER YOUR RELATIONSHIP AS ATTORNEY FOR THE ESTATE OF E L CARTER TERMINATED AS OF THIS DATE REASON FOR THIS IS THAT YOUR SERVICES ARE NO LONGER REQUIRED I HOPE THAT YOUR FEE FOR PAST SERVICES CAN BE SUCCESSFULLY LIQUIDATED AS SOON AS POSSIBLE."

This litigation really contains two phases, first, whether Jacoway is entitled to the $3,000.00 for defending the first suit filed by Carter's sister, and ex-wife, and second, whether Jacoway is due a fee, and if so, in what amount, for services contemplated in Paragraph 3 of Carter's letter of November 26, 1963, to Jacoway.

We will first discuss the $3,000.00 item. Carter's defense to this portion of the fee is that Jacoway did not defend the suit on the merits nor give him "final protection" against the charges made in the complaint. The record reflects that Jacoway held a number of conferences with his client, discussing the charges that had been brought, reviewing a settlement agreement that Carter had previously entered into with a sister, and reviewing the divorce proceedings with Helen Carter. The attorney testified to a number of conferences with Attorney Phillip Allen of Little Rock, who represented Mrs. Wallace and Mrs. Carter. A number of pleadings were filed, and the case was transferred from First Division Chancery Court to Second Division. A temporary injunction was modified so that Carter could continue as trustee, and a motion was filed by Jacoway to make the complaint more definite and certain; further, a settlement was discussed between Jacoway and Allen. However, no agreement could be reached, and sometime in March, 1963, Allen took a non-suit.

Let it first be said that there was, of course, nothing that Jacoway could do to prevent the non-suit being

taken. This was a matter entirely beyond his control. Allen testified that he dismissed the suit without prejudice, because he discovered that he could not obtain enough evidence to sustain the charges and allegations, and the attorney stated that if he refiled the complaint, it would not be on these same allegations.[2] Allen still represents Mrs. Wallace and Mrs. Carter, and appellee is of the view that Carter has received "final protection" from the charges in the Pulaski County complaint, since the suit was dismissed on March 7, 1963, and any attempt to reinstate those charges would likely be barred by laches or limitations. However, be that as it may, Jacoway testified that he told Carter repeatedly during 1963, and while the latter was still in Little Rock in 1964, that a "petition for instructions" should be filed, "that we ought to try to get him completely cleared not only on these charges but on everything past. That we ought to come in and set up what he had done and ask for the court's approval of it and I never could get him to do it. He did not want to come into court. He did not want to arouse sleeping dogs." We find no denial of this statement by Carter, but even so, the Chancellor is in a better position (than this court) to determine the truth of disputed statements. Jacoway denied that he was required to defend the case on the merits in order to earn the fee, and, of course, the letter, heretofore quoted, which sets out the agreement, makes no mention of that fact. Many suits are successfully defended without a trial being held, i. e., they are frequently settled to the satisfaction of a defendant, or a suit is sometimes dismissed by a plaintiff simply because of a show of strength on the part of the defendant. We do not think the court erred in allowing the $3,000.00.

Jacoway, in his pleadings, sought recovery of the $10,000.00, mentioned in Paragraph 3 of the letter, but the court allowed the sum of $6,250.00 on a *quantum*

---

[2] A suit actually has been filed in Federal District Court in Denver, Colorado, but none of the charges, according to Allen, are based upon the same allegations that were contained in the complaint under discussion.

*meruit* basis, holding that this was the reasonable value of legal services rendered by the attorney to Carter, as trustee of the testamentary trust.[3]

Appellant seems to take the position that Jacoway was not entitled to the $10,000.00, or any part thereof, unless the hotel was sold. Of course, it is correct that it was contemplated that the $10,000.00 fee would not be paid until after the hotel was sold, but this was true only because of the fact that the trust estate could not be finally liquidated until after the sale of the hotel. This contention will subsequently be more fully discussed.

Jacoway, although he stated that he could not be exact because he did not always keep a record of time spent on Carter's business, testified to the approximate amount of time that he had spent representing the trust estate, and four Little Rock attorneys gave opinions as to the reasonable value of Jacoway's services, ranging from $6,500.00 to $7,500.00. Carter asserts that most of Jacoway's time was spent in efforts to sell the Colburn Hotel, which, according to Carter, involved no legal work, and for which Jacoway was to be paid by getting a part of the fee that he (Carter) would receive from the Turners for selling their interest.

The court did not set out the basis of the $6,250.00 allowed, but we do not agree that the record shows that Jacoway was acting as merely a "real estate broker," in the effort to sell the Denver property. The lawyer denied this statement, and he mentioned labors performed for the trust, in working out, from a legal standpoint, problems connected with the sale of the hotel. The letter (November 26, 1963) offers no suggestion that Carter's claim is correct, and the evidence further shows that Jacoway's expenses were to be paid for the two Denver trips (which would hardly seem to be in

[3]The court also rendered judgment in the amount of $161.30 for a balance due on expenses incurred in connection with the legal services.

line with Carter's contention). Appellant mentioned that he wanted Jacoway to go to Denver, because of the latter's experience in "sales and contracts." Mr. Carter classed this as the services of a "real estate salesman," but certainly the "contract" feature speaks more of legal services. Of course, it goes without saying that attorneys almost daily render services to their clients in connection with real estate sales, and this frequently includes being present at the sale itself.

It will be remembered that the letter of November 26, 1963, written by Carter, first sets out in Paragraph 2 the requirements to enable the $4,500.00 fee to be earned. In Paragraph 3 the requirements for the minimum fee of $10,000.00 are set out. *It is only after both of these matters are fully covered* that Carter, in his letter states:

"*In addition* [our emphasis,] I have agreed individually to pay you half of any net amounts * * * that I may receive from Miss Evelyn Turner or her mother * * * for my services * * * in selling their interest in the Colburn Hotel."

It seems very clear that the Turner fee (based on the sale of the Turner interest in the hotel) was to be in addition to the other amounts already mentioned, and, in fact, Carter subsequently (by letter of March 22, 1964), suggested that this arrangement (splitting of the Turner fee) be abrogated, and he said that he would pay a reasonable attorney's fee in lieu thereof. While this letter related to the individual agreement between the two, it is mentioned because it shows affirmative recognition of the fact that legal services had been rendered, which was subsequently denied by Carter. Ten days later, Jacoway responded to this letter by writing Carter:

"I want you to treat this letter as my voluntary termination of the agreement so far as it relates to any money that you, as an individual, might receive from

the Turners or from the sale of their property."....

He added:

"This letter does not affect in any way, of course, the fees that we have agreed on to be paid to me for representing you as Trustee of the E. L. Carter Trust, and they will remain fixed as agreed."

Carter approved the contents of the letter by signing his name beneath the words, "the above correctly sets forth my understanding of the agreement." The evidence quoted is rather persuasive to the effect that Jacoway was rendering legal services.

Carter's testimony is not at all clear in some instances. For example, he stated in his testimony. that Jacoway never represented him as an attorney, or acted as an attorney for the estate after the non-suit was taken in the original lawsuit. This statement was re-iterated several times, though subsequently Carter said that he did employ Jacoway to handle additional matters for the trust. Again, Carter stated that he was shocked when Jacoway called him over the phone wanting some money, because he (Carter) assumed that he did not owe Jacoway anything. Appellant stated that he had paid the $1,500.00 fee, and the hotel had not been sold, so he did not understand why he owed Jacoway more money. However, as already pointed out, he subsequently wrote Jacoway a letter telling appellee to send him a statement for legal services to the trust—and then—just a few days later—Carter sent the wire to Jacoway advising that the latter's services were no longer required as attorney for the estate, and mentioning that "I hope that your fee for past services can be successfully liquidated as soon as possible." So apparently, Carter, both from his letter and telegram, did recognize that Jacoway was due some additional fee.

Appellant, in his brief, states that "surely an attorney who tells his client to get another lawyer cannot

contend that he has been wrongfully discharged.'' We do not consider Jacoway's message to Carter to mean that he (Jacoway) was cancelling the contract between the two men. Certainly, a lawyer is entitled to request and receive some part of the fee which he feels to be due without such a request being taken as a withdrawal of representation. Though Carter wrote Jacoway to send a bill, setting out the work that had been done, in less than ten days thereafter, he sent the telegram terminating Jacoway's services. In plain everyday language—he fired him! This brings us to Carter's contention that, at any rate, Jacoway was not entitled to a further fee because the trust assets had not been distributed, the trust had not been terminated, and he (Carter) had not obtained an appropriate order of discharge.

Let it be remembered that the trust *could not* be terminated until the Colburn Hotel was disposed of, and Carter relies heavily upon that fact. The simple answer to appellant's argument is that, irrespective of when the hotel was, or is, sold, Jacoway would not, or will not, be able to render services to terminate the trust estate, for the reason that Carter ended the attorney's employment. Jacoway testified that he was ready and willing to carry out his part of the agreement at the time he received the notice of termination, but it is obvious that he was not given an opportunity to do so.[4] We held, as early as 1878, that a lawyer who is wrongfully discharged is entitled to the entire fee as fixed by the agreement, regardless of how much work has been performed. *Brodie, et al* v. *Watkins*, 33 Ark. 545. That holding has been reiterated several times.

Here, appellee was not awarded the full fee, but only a portion thereof on a *quantum meruit* basis. We are unable to say that the Chancellor's award was improper, or that his findings were against the preponderance of the evidence.

Affirmed.

---

[4] The other beneficiaries of the trust are not objecting to Jacoway's fees.